**LIBERTY MUTUAL INSURANCE COMPANY, Appellant,**

v.

**Raymond E. CHESNUT, Appellee.**

**No. 6481.**

Court of Civil Appeals of Texas, El Paso.

July 7, 1976.

Rehearing Denied Aug. 18, 1976.

Rassman, Gunter & Boldrick, John E. Gunter, Midland, for appellant.

Finley & Scogin, Robert Scogin, Kermit, for appellee.

## OPINION

PRESLAR, Chief Justice.

This is a workmen's compensation case in which the claimant was severely injured in an automobile accident while going to work. Three co-workers who were occupants of the car were killed; their cases are companion cases to this one and the disposition of this case controls theirs. The four cases were consolidated for trial purposes only, and, based on a jury verdict, judgment was entered for the claimants and the insurer appeals. We affirm.

The principal question on appeal is whether the injuries were sustained in the course of employment within the meaning of Sections 1 and 1b of Article 8309, Tex. Rev.Civ.Stat.Ann. Also present are questions of waiver of objections to the Court's charge and admissibility of evidence over objection that it is hearsay.

The four cases result from an automobile collision which occurred on April 11, 1974, while a drilling crew of four was en route from Odessa, Texas, to work at a rig site in a remote area of Pecos County in the vicinity of Fort Stockton, Texas. The driller, Mr. Branum, was driving his personal automobile and was carrying his crew consisting of Messrs. Chesnut, Ramos, and Escarcega. All were killed except Mr. Chesnut who was severely injured. The distance from Odessa to the rig site was approximately 105 miles. The accident happened on a public highway about halfway between Odessa and the rig site. The employer, Johnn Drilling Company, under a written agreement with the driller, paid him 14¢ per mile for use of his personal automobile. In response to two special issues, the jury found that both the driller and the crew members were in the course of their employment.

■ By its first seven points of error, Appellant complains of the failure of the trial Court to grant its motion for directed verdict, its motion for judgment notwithstanding the verdict, and the submission to the jury of the issues on course of employment. The determination of these points

involves the question of the legal sufficiency of the evidence to sustain the jury's findings on the issues of course of employment. In deciding these "no evidence" points, an Appellate Court must consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965).

As indicated, the first issue inquired whether the driller was injured in the course of employment, and the second issue inquired whether the crew members were injured in the course of employment. These issues were followed by instructions of the Court substantially in the wording of Sections 1 and 1b of Article 8309. As material here, Section 1 provides:

" * * * 'injury sustained in the course of employment' * * * shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere. * * *"

Section 1b of Article 8309 was added by the Legislature in 1957; it provides:

"Unless transportation is furnished as a part of the contract of employment or is paid for by the employer, or unless the means of such transportation are under the control of the employer, or unless the employee is directed in his employment to proceed from one place to another place, such transportation shall not be the basis for a claim that an injury occurring during the course of such transportation is sustained in the course of employment. * * *"

It is now well settled that the effect of the addition of Section 1b to Article 8309 is to limit the instances when recovery will be allowed to those enumerated in Section 1b. *Reid v. North River Insurance Company*, 508 S.W.2d 683 (Tex.Civ.App.—El Paso 1974, no writ).

The general rule is that injuries suffered by employees while traveling on pub-

lic streets and highways in going to and returning from work are not compensable. *American General Insurance Company v. Coleman*, 157 Tex. 377, 303 S.W.2d 370 (1957). To have a compensable injury, then, for injuries received going to or from work, the employee must bring himself within the provisions of Section 1, that is, that the injuries were of a kind and character that had to do with and originated in the work, business, trade or profession of the employer, and were received while the employee was engaged in or about the furtherance of the affairs or business of the employer. *Texas General Indemnity Company v. Bottom*, 365 S.W.2d 350 (Tex.1963). Additionally, he is limited to and must bring himself within the provisions of one of the four instances enumerated in Section 1b. As the Supreme Court said in *Janak v. Texas Employers' Insurance Association*, 381 S.W.2d 176 (Tex.1964):

"Sec. 1b, Article 8309, enacted in 1957, has two parts. The first part declares injuries during travel to be in the course of employment, and therefore compensable, only when transportation is (1) furnished as a part of the contract of employment, or (2) is paid for by the employer, or (3) is under the control of the employer, or (4) when 'the employee is directed in his employment to proceed from one place to another place.' * * *"

In *Agricultural Insurance Co. v. Dryden*, 398 S.W.2d 745 (Tex.1965), the Court quoted the above from *Janak* and then said:

"It necessarily follows that an injury occurring during transportation cannot be the basis of a claim that such was sustained in the course of employment, as required by Section 1 of Article 8309, unless one of the prerequisites enumerated in the first sentence of Section 1b is present. * * *"

In our opinion, the crew members, Chesnut, Ramos, and Escarcega, qualify under (1) of Section 1b as set out in *Janak* above, and the driller, Branum, falls under number (2) thereof as a prerequisite to his

recovery; and, under the jury findings, they met their burden of bringing themselves within the "prerequisite," proving their injuries were sustained in the course of employment within the meaning of Section 1 of Article 8309.

Under a written contract with its drillers, Johnn Drilling Company paid them 14¢ a mile for travel to and from the job site. The driller and all of the crew members lived in Odessa, 105 miles from the job site. The driller drew 14¢ a mile for each 210 mile round trip, seven days a week, for a total of some $784.00 per month for the use of his car. The Company president testified that this mileage was paid to compete in the labor market and because it was the driller's responsibility to get the crew on the job; he testified that this was a benefit to the Company and "I guess you could say" it was part of the driller's work contract. The inference is that the driller was performing a service for his employer in the transporting of the crew to the job site.

The drilling rig operated 24 hours a day non-stop, and there was a change of crews each 8 hours; a four man crew consisted of the driller, derrick man and two floor hands, each with a specific job to do. Each driller hires his own crew and it is his duty to have them at the well site; the crew was not required to ride with the driller, but they were told when they were hired that they would have this free transportation and they usually rode with the driller except when they needed their own car for some personal cause. A driller had the right to hire and fire, and he could fire a crew member who refused to ride with him. There was testimony from a driller that he would not work for anyone who did not pay transportation and, likewise, a crew would not work without such free transportation. Under the chain of command on a drilling rig, the drillers worked for the toolpusher, and a toolpusher testified that a driller who did not transport his crew to the job site "would not work for him" and that he "would not be a driller" if he did not have a crew out there on the job site. The impor-

tance to the employer of having a full crew at this remote job site is emphasized by the fact that this was a rush operation; the well was being drilled for Gulf Oil Corporation and they had an early expiration date on their lease; and, in that connection, they induced or authorized Johnn Drilling Company to pay $6.00 a day completion bonus. Both the driller and crew received this so-called "bottom hole" pay, an incentive to stay on the job to the completion of the well.

However, there is testimony that $4.00 of this $6.00 was for travel pay. The admissibility of this evidence is another point of error, but, assuming it is admissible, it places both the driller and the crew in a position of being paid during the time of going to and from the rig site. The drilling rig had been operating near Crane and when it was moved to this remote site in Pecos County, the $6.00 per day bonus was begun. Chesnut, the survivor of the collision, testified that it was his understanding from a conversation with a driller that they would be paid $4.00 per day "road time" and $2.00 "bottom hole" pay. This accident occurred about a week after work commenced at the Pecos site so there had been no pay period at that time. Those who completed the rig were paid this $6.00 per day and there is evidence from the employer's records that one crew member who did not complete the well was paid $4.00 a day for the days that he did work. Our review of the facts indicates that there are benefits flowing to the employer from the services of the driller Branum in getting the crew to the rig. It was his duty to get the crew to the job site, he was paid to do that, and he was in the process of doing that when he was killed. We cannot say as a matter of law that his injuries did not occur in the course of employment as found by the jury.

Possibly the leading case construing Section 1b of Article 8309 is *Janak v. Texas Employers' Insurance Association*, supra. In *Janak*, the claimant was a member of the drilling crew and had participated in a car pool arrangement. At the time of the

accident, Janak was a passenger in a car owned and operated by a fellow crew member, and that crew member had deviated from the usual route of travel to get ice to take to the job site. The Supreme Court held that, by procuring ice for the drinking water, the driver of the automobile was performing services in furtherance of the employer's business. The Court reasoned that the drinking water was reasonably essential to the continuation of the drilling operations to such a point that a deviation to obtain it is impliedly directed by the employer. Also, the Court refused to recognize a distinction between the automobile owner-operator and the passenger, Janak, in allowing compensation, saying:

" * * * If on a particular trip the automobile-operator member of the carpool must perform a service in furtherance of the employer's business, the others must go also or abandon the carpool. To expect them to abandon the carpool if the deviation is not extreme is utterly unrealistic; *and it is also unrealistic, therefore, to draw an imaginary line between the crew member who operates the automobile and the crew member who is but a passenger and say that the one is entitled to compensation benefits if injured but the other is not.* * * * " (Emphasis supplied).

That language covers the situation in the case before us, but we are reluctant to say that it controls our case. In applying the rules governing injuries sustained in travel, each case must be decided upon its particular facts. The facts of *Janak* differ from ours in that it was the obligation of all the crew members to get the ice and they rotated the deviation to get it. In our case, only the driller is paid and there is no deviation. However, we think that the facts of our case do bring it within the overall doctrine of the *Janak* case in that while only the driller was being paid, it was the "plan" or "arrangement" that was of benefit to the employer and it required the cooperation of the crew in riding with the driller. In other words, it was worth nothing to the employer to get the driller alone to the rig site;

rather, his benefits flowed from the arrangement or plan of paying the driller and making it his duty to get the crew to the job site. The success of this plan and the participation of the crew in it placed them all on an equal footing of entitlement to compensation as in the *Janak* case.

A more recent Supreme Court decision involved a fact situation similar to *Janak*. *Johnson v. Pacific Employers Indemnity Company*, 439 S.W.2d 824 (Tex.1969). The Supreme Court held that the Court of Civil Appeals erred in finding as a matter of law that Johnson deviated from his regular route of travel solely for his personal benefit. It was held that Johnson's injuries were compensable, as he was traveling an alternate route in the course of his employment at the direction of the employer. The Court said:

" * * * We held in *Janak v. Texas Employers' Insurance Association*, 381 S.W.2d 176 (Tex.Sup.1964), that the transporting of ice to a drilling rig is in furtherance of the employer's business. We now hold that it is also in furtherance of the employer's business that the transportation be under circumstances which will give assurance to the members of the drilling crew that the ice and water will be available at the beginning of the work day. * * * "

In our case, the plan of getting the crew to the rig in the driller's car was of benefit to the employer and gave assurance that a full crew would be available on time.

A case almost identical to the one before us on its fact situation is *Texas Employers' Ins. Ass'n v. Inge*, 146 Tex. 347, 208 S.W.2d 867 (1948). Inge was a member of a drilling crew killed in a car accident on the highway while going to and from the drill site in a remote area of Pecos County. When employed, he was told that all the workmen went to and from the rig site in private cars and that the workman furnishing his car for the transportation of himself and his fellow workmen would receive 7¢ per mile in addition to his regular pay. The Supreme Court noted that the fact that the

fatal wreck occurred on the State Highway and not on the employer's premises would not necessarily preclude recovery if, under the facts of the case, his injuries did originate in the work of the employer and were received while engaged in or about the furtherance of the employer's affairs or business. The Court then wrote about an exception to the general rule that a workman going to and returning from work is not acting in the course of his employment as being one where the transportation is furnished by the employer as a part of the contract of employment. On the matter of originating in the work of the employer and in furtherance of the employer's affairs or business, the Court used language which is applicable to the case before us saying:

" * * * The location of the drilling site in an uninhabited area made it essential that Appelby furnish transportation to his employees in order to induce them to work on this job. The substance of the arrangement was that the members of the drilling crew were being transported to the well location free of cost to them; and this was an important part of their contract of employment. Those workmen riding in Inge's automobile were given free transportation and the mileage fee paid to Inge presumably was sufficient to take care of his expenses in operating his own automobile. Due to wartime conditions then existing, the arrangement which was made was probably the only one which was practical under the circumstances. The employer's affairs and business were being furthered by the transportation of the members of the crew to and from the well site in Inge's automobile as effectively as if the employer himself owned the automobile which was being used."

In our case, with jobs plentiful in the Odessa area where the crew lived, it was probably a necessity that the employer have the arrangement that he did to induce them to work at this remote site 105 miles away that required four hours per day of travel time; and, as noted earlier, it was of benefit to have them all arrive at the same time

and to have the assurance that a full crew would be there for each shift change so that operations could be continuous.

Appellant urges that *Inge* no longer applies and cites *Bales v. Liberty Mutual Insurance Co.*, 437 S.W.2d 575 (Tex.Civ.App.—Amarillo 1969, no writ). In *Bales* a statement was made that, since the case was tried before the addition by the Legislature of Section 1b to Article 8309, the case no longer applies. The claimant Bales was attempting to bring himself within the "access" rule or some "special mission" exception and cited the *Inge* case in support of his position. The Court noted that the claimant had failed to bring himself within one of the four exceptions of Section 1b, and then made the statement that *Inge* no longer applies. In that, the Court was correct because "special mission" and "access" were not one of the four exceptions brought forward in Section 1b by the Legislature. However, the provision in *Inge* as to transportation furnished as a part of the contract of employment was brought forward in Section 1b. In effect, Section 1b had codified *Inge* in that regard. Our research indicates that *Inge* is still good law in that it has never been overruled, modified, or otherwise distinguished by subsequent decisions.

A case relevant to the one before us is *Millers Mutual Fire Insurance Company of Texas v. Rawls*, 500 S.W.2d 545 (Tex.Civ. App.—Beaumont 1973, writ ref'd n. r. e.). In that case, the deceased employee, an eight year old minor boy, was employed by a poultry company, along with other school age boys, to gather chickens at the company's broiler house. The boys were picked up at their homes late in the evening, driven to the broiler house where they performed their work, and then returned to their homes later the same night. The deceased employee was returned home after work in a company pickup driven by a company employee, and he got out of the truck across the highway from his home and was struck and killed by a passing automobile as he attempted to cross the highway. In upholding an award of death

benefits, the Court found that the deceased employee's travel to and from home was closely related to the company's business saying:

" * * * In no other way could they have obtained the services of an eight year old boy in the night time and in a different county. It was a necessity and not an accommodation and the risks of his travel were as real and job related in crossing the highway as in riding in the truck. * * * "

The facts of the case before us indicate a necessity to get employees to work at this remote site and not an accommodation in the furnishing of transportation. We cannot say as a matter of law that the injuries to the claimant Chesnut and the death of the other crew members, Ramos and Escarcega, did not occur in the course of employment.

■ During the course of the trial, the Appellee Chesnut, the sole survivor of the accident, testified that it was his understanding of his contract of employment that he was being paid $4.00 per day riding time and $2.00 per day "bottom hole" time. This testimony came after the employer had offered testimony that the $6.00 per day was all "bottom hole" pay. Chesnut gave as the source of his information one Kelly, a driller who was deceased at the time of the trial. He was not permitted to testify as to what Kelly said, but only that it was his understanding from talking to Kelly the $6.00 per day was broken down as $4.00 riding time and $2.00 "bottom hole" pay. We think this evidence as to his understanding of the terms of the oral contract was admissible. At least one case has held that testimony of the understanding of a contract made through a broker was admissible to establish the terms of the contract. *Rosebud Oil & Cotton Co. v. Merchants' & Planters' Oil Co.*, 248 S.W. 116 (Tex.Civ. App.—Austin 1922, no writ), the Court saying:

" * * * We do not think the evidence was hearsay, as the testimony related to the contract as understood by Mr. Rice,

and as gained from the statements made by Mr. Terrell, who was the broker, and who represented both parties in the transaction. As we understand this testimony, Mr. Rice did not undertake to testify what conversation passed between Mr. Terrell, the broker, and Mr. Roper, appellant's manager, in the first telephone communication, but simply his understanding of the contract which he made through the broker."

And in a later case, *McDonald v. McDonald*, 143 S.W.2d 142 (Tex.Civ.App.—Austin 1940, writ dism'd judgmt. cor.), it was held that where the statements by an agent within the scope of his authority were the operative facts of an oral contract, they were admissible, and not regarded as hearsay. Authority cited was 6 Wigmore, Evidence (3d ed. 1940, Section 1770). And in a more recent case, *Irving Lumber Company v. Alltex Mortgage Company, Inc.*, 446 S.W.2d 64 (Tex.Civ.App.—Dallas 1969), aff'd, 468 S.W.2d 341 (Tex.1971), it was held where a contractor, to establish a mechanic's and materialman's lien, was required to prove that it had an oral contract with the developer that testimony of the contractor as to conversations with the president of the developer was not inadmissible hearsay as to the lender, the Court saying:

" * * * It has also been held that out of court statements are not hearsay when tendered to show offer, or acceptance in suits on a contract. See Vol. 1, McCormick and Ray, "Texas Law of Evidence", Section 795, and cases there cited; also see 31A C.J.S. Evidence §§ 260–261, p. 680–682."

The case was affirmed by the Supreme Court on other points. There was no discussion of the evidence question. 468 S.W.2d 341 (Tex.1971).

■ We have concluded that under Rule 272, Tex.R.Civ.P., Appellant has waived its objections to the Court's charge. The objections were dictated to the Court reporter in the presence of the Court and opposing counsel before the reading of the Court's charge to the jury, and they appear in the

statement of facts. The case was tried before the amendment of Rule 272, which was effective January 1, 1976; prior to the amendment, a further requirement of Rule 272 was that the Court's ruling and official signature be endorsed on a transcribed copy of the objections as dictated. The cases are uniform in holding that the failure to comply with that portion of the Rule amounts to a waiver of the objections. *T & L Lease Service, Inc. v. Biddle*, 500 S.W.2d 186 (Tex. Civ.App.—Houston 1973, no writ); *Town of Lindsay, Texas v. Cooke County Electric Cooperative Association*, 497 S.W.2d 406 (Tex.Civ.App.—Fort Worth 1973), rev'd on other grounds, 502 S.W.2d 117 (Tex.), cert. denied, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

All points of error have been considered and all are overruled. The judgment of the trial Court is affirmed.